[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff has appealed from an assessment of damages of $19,000 made by the defendant Commissioner of Transportation for taking a strip of land along Buckland Road and Deming Street in South Windsor. The land taken in is situated at the northwest corner of the plaintiff's property and measures 0.304 acre. A drainage easement of 0.018 acre and an easement to slope of 0.056 acre for support of the widened highway were also taken. The condemnation also included temporary rights to construct driveways and grade affecting 0.076 acre, and also to install a sedimentation control system and remove a barn.
The land, easements and rights referred to were acquired by the state on January 14, 1993 for the purpose of widening Buckland Road in South Windsor from two lanes to four lanes.
On April 29, 1988, the plaintiff purchased the 22.1 acres affected by the condemnation. Only 15.60 acres, however, could have been used for development purposes, because the remaining 6.50 acres is in a designated inland-wetlands area for which special permits are required that are very difficult to obtain. The plaintiff's president, Richard Kelley, testified that, although all the land was situated in a residential zone, he had bought the property in the belief CT Page 981 that eventually the 2.75 acres of land fronting on Buckland Road would be included in a change to a commercial zone. He claimed that he had valued the 2.75 acres at $400,000 in deciding to purchase the entire tract of 22.1 acres for $900,000, the balance of $500,000 being allocated to the 19.35 acres of residential land, including 6.5 acres of wetlands. The plaintiff's appraiser Peter Marsele, valued the entire 22.1 acres at $962,600 before the taking and at $742,000 thereafter, resulting in an estimate of $220,600 as damages. (Ex. I p. 9) His analysis of the land before the taking divides the 22.1 acres into two parcels, a 19.35 acre parcel of residentially zoned land that includes the wetlands areas, which he valued at $387,000 and a 2.75 acre parcel fronting on Buckland Road, valued at $539,000. (Ex. I pp. 5-6). The unit values used in making these valuations are $20,000 per acre for the 19.35 acres of residential land, including the wetlands, and $4.50 per square foot (S.F.) for the 2.75 acres proposed for commercial development. In addition Marsele included $36,600 for the value of the barn partly situated on the 0.304 acre taken in fee by the state in arriving at his total of $962,600 as the value of the entire 22.1 acres before the taking. He conceded, however, that the value allocated to the barn should be omitted from a valuation of the Buckland Road property as land to be developed for a commercial use, because the barn would probably be removed in order to use the land for such a purpose.
Marsele estimated the value of the land remaining after the taking at $742,000, finding no change in the $387,000 value of the 19.5 acres of residential land, but concluding that the value of the 2.75 acres of potentially commercial land on Buckland Road had been reduced by the taking from $539,000 to $355,000, a difference of $184,000. That decline in value is based on: (1) a reduction of $1.12 S.F. in the unit value of the remaining unencumbered commercial land; (2) a reduction of $2.81 S.F. in the unit value of the remaining commercial land that is encumbered by the permanent easements for drainage and for sloping to support the highway; and (3) the loss of .304 acres of commercial land taken in fee by the state valued at $4.50 S.F. Marsele's unit value of $4.50 for the Buckland Road property S.F. before the taking or $146,020 per acre is based on three sales of commercial land at higher unit values that he reduced by net adjustments varying from forty-five to sixty-five per cent, for such factors as the need for a zone change, the lapse of time since the sale, the CT Page 982 configuration of the property and other considerations.
The commissioner's appraiser, Brian Marchi, used a unit value of $40,000/acre in reaching his valuation of $895,080 for the entire tract of land before the taking, including the wetlands, but he added $6788 for various improvements that were destroyed by the highway widening, including a barn, to arrive at a total value of $901,868. After the taking, his valuation of the land remaining was $881,440, a reduction in value of $20,428. The commissioner's assessment of damages, however, was only $29,000. The $20,428 in damages found by Marchi is based on: (1) the loss of 0.304 acre taken by the state in fee at a unit value of $40,000/per acre; (2) a reduction by one half in the value of the 0.018 acre that has been encumbered by the drainage easement; (3) reduction by one half in the value of the 0.056 acre encumbered by the slope easement; and (4) the removal of the improvements that he valued at $6788. He found that no damage would occur to the land outside the areas taken in fee or affected by the easements. (Ex. 4, pp. 2a-2c)
Marchi valued the entire tract of land as residential acreage at $40,000 per acre without any special allowance for a potential zone change for the 2.75 acre parcel along Buckland Road. His report states that in his conversation with Marcia Banach, who has been the director of town planning for eight years in South Windsor, "it was revealed that the potential of the subject being rezoned from residential to commercial was improbable prior to the State's project." (Ex. 1, p. 2). The report states further, however, that Banach told Marchi that the town "is now in the process of replanning the area along Buckland Road on account of the State's project and that there now exists a fairly high probability of a zone change to commercial." (Ed.) The report continues: "This would seem to indicate a potential benefit situation since the State's project would be responsible for a higher value of the subject property after the acquisition (i.e. the value of commercial land is more valuable than residential land). This premise would need to be proven through market data, which as yet, has not been sufficient enough to warrant a benefit adjustment within the text of this report. The trend is evident but not proven, therefore this appraiser has found it necessary to value the subject as residential acreage." CT Page 983
Marcia Banach, the Town Planner for South Windsor, was called by the plaintiff to testify at the hearing. She said that the widening of Buckland Road had been expected in the town for at least the eight years that she had been the town planner. When the existing town plan was originally proposed for South Windsor, it recommended that the land along Buckland Road be zoned for commercial use, but this recommendation was omitted prior to adoption of the plan in September, 1987. Banach testified that the town planning commission is currently working on a revision of the plan that would probably include a proposal for a change from residential to commercial for the property along both sides of Buckland Road, which would include the plaintiff's property. She testified that she expected the revised town plan to be finalized by the end of 1993. She said that the widening of Buckland Road was a factor in precipitating the current review of the town plan, but that other significant factors were the extensive commercial development that has occurred in recent years in the Manchester Mall area, located about one mile south of the subject property on Buckland Road, the large volume of traffic on Buckland Road that has existed for several years, and recent commercial developments on Buckland Road at both its northerly and southerly ends in South Windsor, less than one mile from the subject property. These factors, in her judgment made the land along Buckland Road unsuitable for residential development and supported a commercial development.
There are three principal issues in this case: (1) the potential for a zone change from residential to commercial for the 2.75 acres fronting on Buckland Road; (2) whether any such zone change and the resulting increase in value would be attributable to the project for which the land has been condemned; and (3) the impact of the taking on the economic potential for a commercial development on the portion of the 2.75 acre remaining after the taking. "It cannot be doubted that both a prospective purchaser and a seller on the open market would consider the probability of a change in zoning restrictions affecting property which they considered buying and selling where such a change was reasonably probable in the reasonably near future. Accordingly, where such a change is reasonably probable and not merely a remote or speculative possibility, the probability may properly be considered in the determination of the fair value of property taken by eminent domain. This is the rule applied in the CT Page 984 majority of jurisdictions which have considered the problem." Ruschak v. West Haven, 167, 564, 570.
 I
The evidence produced by the plaintiff in particular the testimony of Banach the South Windsor town planner, is more than adequate to support a finding that a reasonable probability of a zone change from residential to commercial for the 2.75 acres fronting on Buckland Road existed on the taking date, January 14, 1993. Banach testified unequivocally that such a change would probably be included in the revision of the town plan currently being considered. The court's view of the property and its environs corroborates her testimony that Buckland Road has become a very busy highway largely because of the continuing expansion of commercial development in the area of the Buckland Mall, approximately one mile south of the plaintiff's property. The land diagonally across Buckland Road and Deming Street from the 2.75 acres was changed from a rural residential to a restricted commercial zone, in which professional offices, retail stores, personal service shops and restaurants are among the uses permitted. (Ex. E, H). Within such a zone, the plaintiff has already erected a large commercial development about one half mile north of the subject property.
The court concludes that on the condemnation date there was a reasonable probability of a zone change in the near future to permit commercial uses for the 2.75 acres along Buckland Road. For that probability, the market would undoubtedly pay a premium above the prevailing price of residential land.
 II
The commissioner's appraiser, Marchi, recognized that "there now exists a fairly high probability of a zone change to commercial." (Ex. 1, p. 2) He valued the 2.75 acres as residential land, however, because he believed that "the state's project would be responsible for a higher value of the subject property after the acquisition." (Id.) "The general rule is that any enhancement in value which is brought about in anticipation and by reason of a proposed improvement is to be excluded in determining the market value of the land." Shriver v. Ives, 162 171, 179 (1972). CT Page 985
Marchi's report that, in his conversation with Bernachi, the town planner, "it was revealed that the potential of the subject being rezoned from residential to commercial was improbable prior to the state's project" is in conflict with Banach's testimony. She testified that the plan to widen Buckland Road to four lanes had been known in the town for at least the eight years that she had been the town planner. A proposal for a change to a commercial zone along both sides of Buckland Road had been included in the original proposal for the 1987 revision for the town plan, but was removed from the plan as adopted. Banach conceded that the actual commencement of the Buckland Road widening project was one factor that had brought about the current review of the town plan, which she expected to include a change to a commercial zone for Buckland Road, but that there were several other significant factors, most of which are related to the expansion of the Buckland Mall area as a major retail development and the related increase in traffic on Buckland Road for the past several years.
Even without the widening of Buckland Road, it would have been reasonably probable that a change of zone to commercial uses for the 2.75 acres would occur because of the increased traffic generated by the stores at the Buckland Mall. The increased traffic made the land along Buckland Road unsuitable for residential development, but enhanced its suitability for commercial development. The state's decision to commence construction of the widening project was undoubtedly a response to the traffic increase. When the plaintiff purchased the property in 1988, the state's plan to widen the highway was well known in South Windsor and whatever value, enhancement the widening project could possibly have contributed to the 2.75 acres was undoubtedly reflected in the price paid for that land, which was substantially higher than its value as residential property because of the probability of a zone change.
The court concludes that the probability of a change to a commercial zone along Buckland Road was substantial on the condemnation date and that the actual commencement of the widening project has merely accelerated the realization of this probability to a slight extent.
III CT Page 986
In analyzing the effect of the taking on the value of the plaintiff's remaining land, its appraiser, Marsele found no change in the value of the 19.35 acres of land intended to be developed for residential purposes, which he valued at $387,000 or $20,000 per acre. The 19.35 acres is comprised of 6.50 acres of wetlands and 12.85 acres of land to be developed for residences. The wetlands area forms a buffer approximately 500 feet wide between the 2.75 acre strip along Buckland Road and the eight lot residential subdivision that the plaintiff is developing. The court agrees with Marsele that all the damages caused by the taking are confined to the 2.75 acre parcel.
Since the state's appraiser, Marchi, made no separate valuation of the 2.75 acres on Buckland Road but used $40,000/acre for the entire tract as residential property, his report is not helpful in evaluating the effect of the condemnation on that property, for which the court has found the probability of a zone change. Marsele used a unit value of $196,000/acre in his appraisal of $539,000 for this land before the taking. That unit value finds some support in his comparable sale #6 of approximately one acre of land with 328 feet of frontage on Route 5 in South Windsor for $360,000. That sale Marsele discounted by 45 per cent, of which 25 per cent was for the difference in zone, in arriving at his unit value. The other two sales he used were of properties on Main Street and Center Street in Manchester, several miles from the subject property, where different zoning regulations apply. The fact that the discounts used on the three comparable sales to find a unit value for the subject property vary from 45 per cent to 65 per cent indicate that none of the properties are very comparable.
The most significant comparable sales that the evidence discloses are the plaintiff's purchase of the entire 22.1 acres of the subject property for $900,000 on April 28, 1988 and its purchase of 15.5 acres of land on the north side of Deming Street on July 28, 1989, for $510,125. The plaintiff has used the 15.5 acre Deming Street property for a seven lot subdivision, indicating a unit value of $72,875 per lot or 32,911/acre. The court's view of the premises reveals that this seven lot subdivision, which the plaintiff has partially completed, is quite similar to the development that it proposes for the residential portion of the subject CT Page 987 property, which is located across Deming Street, with respect to lot size, neighborhood and other factors. Using $72,815 as the value of each lot in the eight lot subdivision, the plaintiff proposes for the 12.85 acres of non-wetlands residential land on the south side of Deming Street results in a valuation of 533,000 or $45,370/acre for that portion of the land. The $12,459 differential between the prices per acre of the two properties is probably attributable to the inclusion of 6.50 acres of wetlands in the subject property, as well as its suitability for an eight rather than seven lot subdivision.
The evidence is sparse with respect to the value of the 6.50 acres of wetlands included in the 1988 purchase. Marsele included the wetlands at $20,000 per acre in his valuation of the 19.35 acres of residential land, but that unit value was probably arrived at by averaging the values of the 12.85 acres of developable land and the 6.50 acres of wetlands. Similarly, Marchi included the wetlands at $40,000/acre in his evaluation of the entire tract of 22.1 acres. The wetlands are accessible from the rear of two of the lots in the proposed subdivision and could be used to enlarge the size of these lots. The are also accessible from Deming Road and could be used for such agricultural purposes as grazing livestock. They have been used for that purpose until recently.
The court concludes that, of the $900,000 paid for the subject property in 1988, $583,000 should be attributed to the residential land and the wetlands, leaving a balance of $317,000 as the price of the 2.75 acres along Buckland Road. There is no significant evidence of any change in property values in the area of the subject property since 1988. The widespread decline in the Connecticut economy generally seems to have been offset by the retail expansion in the Buckland Mall area, which has enhanced the price of real estate in the surrounding environs. Accordingly, the court will use a unit value of $115,000/acre, which is based on a price of $317,000 for the 2.75 acres, in calculating the damages from the condemnation. That unit value includes a premium of $69,630/acre above the $45,370/acre value estimated for the residential land. On the basis of the only sale the evidence discloses of the value of business property in South Windsor, approximately $360,000/acre for the Gutt property on Route 5, such a premium seems reasonable as an evaluation on the taking CT Page 988 date of the probability of a zone change for the plaintiff's property, with allowances for other differences between the properties.
Accordingly, the damages for the land taken in the fee and for the two easements that affect the property adversely, which both appraisers deemed to warrant a one half reduction in the value of the land subject to the easement, are calculated as follows:
 (fee) 0.304 acre x $115,000/acre = $ 34,960 (drainage) 0.018 acre x $115,000/acre x 1/2 = $ 1,035 (slope) 0.056 acre x 115,000/acre x 1/2 = $ 3,220 ________ $ 39,215
The impact of the condemnation on the remaining 2.372 acres of land along Buckland Road is more difficult to calculate. As shown on Exhibit D, even before the taking the width of the available building area on the 2.75 acres was rather narrowly confined because of a sixty-five foot building line along Buckland Road and a forty foot wetlands offset line. These limitations would have permitted the construction of a building within a trapezoid formed by 220 feet of the building line, a line connecting the points on the wetlands offset line sixty-eight feet and forty-one feet from the building line, and the projections of those points at right angles to the building line, as shown on Exhibit D. A rough calculation of the area within such a trapezoid indicates that approximately 12000 S.F. of building area was available on the northerly portion of the 2.75 acres before the taking.
As Exhibit D demonstrates, the taking has resulted in moving the Buckland Road building line by 40 feet on the northerly side of the trapezoid and by 14 feet on its southerly side, reducing the area within the trapezoid by approximately 6000 S.F. or one half of its original area. An additional reduction of approximately 680 S.F. of buildable area has occurred outside the trapezoidal area because of the movement of the Deming Street building line, eliminating a triangle of buildable land that existed before the taking. Another triangle of land adjacent to the southerly side of the trapezoid and comprising 315 S.F. of buildable area has also been lost because of the taking. The total area of the buildable land that has been affected by the movement of the CT Page 989 building lines resulting from the taking is approximately 7000 S.F. according to Exhibit D.
As shown on Exhibit D, the taking does not affect the southerly one third of the 2.372 acres of unencumbered land remaining after the taking. Any severance damages, therefore must be confined to the northerly two thirds of the property which the plaintiff could have used for a 12,000 S.F. building before the taking but which now contains only 6,000 S.F. of buildable area with a depth of only 27 to 28 feet. It is not possible to calculate precisely the damages caused by the reduction of the buildable area as a consequence of the taking. In the judgment of the court, however, the approximate 1.58 acres comprising the northerly two thirds of the 2.372 acres of unencumbered remaining property has lost one half its value as a result of the taking. Accordingly the severance damages are calculated as follows:
1.58 acres x $115,000/acre x 1/2 = $90,850
This amount, when added to the $39,215 of damages found for the fee and easements taken results in a total award of $130,065 damages. Of that amount the plaintiff has received $19,000 leaving a balance of $111,065 to be paid.
It is ordered that the plaintiff recover of the defendant $111,065 as the unpaid balance of the damages found, plus interest thereon at a "rate that is reasonable and just" pursuant to General Statutes 37-3c from January 14, 1993, together with costs pursuant to General Statutes 13a-77 and an appraisal fee of $1500, which the court considers reasonable for the services of the appraiser. If the parties cannot agree upon the amount of interest, the court will hold another hearing for that purpose.
David M. Shea State Judge Referee